UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

VAUGHN DAVIS,                        )
                                     )
          Plaintiff,                 )
                                     )      No. 4:11CV1161 JCH/FRB
                                     )
     v.                              )
                                     )
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
          Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

          This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b), for appropriate disposition.

### I.   Procedural Background

          On February 19, 2009, plaintiff Vaughn Davis
("plaintiff") applied for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"), alleging disability as of
December 4, 2007.  (Administrative Transcript ("Tr.") at 242-51).
Plaintiff's applications were initially denied, and he requested a
hearing before an administrative law judge ("ALJ").  (Tr. 199-200).
On March 17, 2010, a hearing was held before an ALJ.  (Tr. 153-85).
On July 25, 2010, the ALJ issued a decision denying plaintiff's

application.  (Tr. 137-46).

Plaintiff subsequently sought review of the ALJ's hearing decision from defendant agency's Appeals Council.  (Tr. 132-33). On June 7, 2011, the Appeals Council denied plaintiff's request for review.  (Tr. 1-4).  In so doing, the Appeals Council indicated that it had received and reviewed additional medical information from Darlene Eyster, M.D., dated February 15, 2010.  (Tr. 5). Because the Appeals Council denied plaintiff's request for review, the ALJ's decision stands as the Commissioner's final decision.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

During the administrative hearing, plaintiff testified that he was 60 years of age, and had been married for 40 years. (Tr. 157).  He testified that he had health insurance through his wife's employer.  (<u>Id.</u>)  Plaintiff testified that, after high school, he completed two years of trade school in the field of drafting and design technology, but left school early to begin working for McDonnell Douglas in the area of computer-aided drafting and design. (Tr. 157-58).  Plaintiff later transferred to the Automation Division of McDonnell Douglas, where he worked as an instructor.  (Tr. 158).  McDonnell Douglas later sold the Automation Division to a company called Electronic Data Systems, or EDS, and plaintiff then became an EDS employee.  (Tr. 159).

Plaintiff became a Product Manager, which was a marketing position, until EDS eliminated his position in December of 2000. (Id.)

The ALJ asked plaintiff whether he felt he could do an office-type job today, and plaintiff replied that he could sit but that he required frequent restroom breaks due to a side effect of the medication Lasix[1] and to congestive heart failure, diabetes and hypertension. (Tr. 160, 163). Plaintiff then described a previous job in which he had worked in customer service for Western Union:

> Just as an example, one of the previous jobs I had was with Western Union, which was sitting at a computer all day doing customer service. But the thing is, being it was a union job, there was all kind of rules, stipulations tied to that, where you had the specific breaks, and then you had what they called 12 minutes of run-out. And the 12 minutes of run-out, you know, you get up, run to the bathroom, come back, and if it was four minutes, then I have eight minutes left, okay? With the frequency I had, I ate that up pretty quick.

(Tr. 161).

Plaintiff denied that he lost that job with Western Union due to his medical condition, and explained that the company had simply "moved the whole works to Mexico City." (Id.) The ALJ and plaintiff then had the following exchange regarding whether plaintiff was disciplined regarding his frequent breaks:

Question (by the ALJ): So when they would

---

[1]Lasix, or Furosemide, is a 'water pill' that is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. It is also used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html

write you up, what would they do about it?

Answer (by plaintiff): They, the way they had the system set up, they write you up, I think there's, like, five instances. And you can, for lack of better words, work them off. In other words, if you go so long without an instance, it'll drop off your record. Excuse me. My balance kept that to where I was usually at a two or a three, so I never was at a point where they were going to walk in and walk me out, okay. But I was at the point where they were constantly saying [INAUDIBLE]

(Tr. 162).

Plaintiff testified that, at the end of the day, he had edema in his ankles and lower leg. (Tr. 163-64). Plaintiff testified that he had osteoarthritis in both of his knees and had undergone steroid injections, and also took Aleve. (Tr. 164-66).

Plaintiff testified that his present doctors knew he had applied for disability. (Tr. 166). The ALJ asked plaintiff whether his doctors supported this or were neutral, and plaintiff replied, "They're, my opinion is, is they're neutral. Because they haven't really come out either way, you know, saying, you know, "You shouldn't apply," or - - ." (Id.)

Plaintiff testified that he used a C-PAP machine to sleep, and no longer had trouble with sleep apnea. (Tr. 167). He acknowledged that he was obese, and testified that his obesity "definitely" affected him inasmuch as his weight was hard on his knees, did not help his blood sugar, and was related to sleep apnea. (Tr. 168). Plaintiff was asked how long he could sit

-4-

before needing to get up, and plaintiff replied: "[i]f I plan it, I don't drink much, stuff like that, you know, I do an hour. You know, I mean, but, I mean, I can probably time every hour and a half going to the bathroom." (Tr. 169).

Plaintiff testified that he could stand for 15 to 20 minutes. (Tr. 170-71). He testified that, when walking, he had trouble with his knees and with shortness of breath, which he attributed to congestive heart failure. (Tr. 171). Plaintiff described experiencing depression which he attributed to having been laid off from his job after 32 years of service, but denied experiencing suicidal or homicidal feelings. (Tr. 171-72). He testified that he did light work around the house such as vacuuming, but did not do laundry because his laundry facilities were in the basement and he did not like to climb steps. (Tr. 172-73). He testified that he used to go fishing every weekend, but now had trouble "[g]etting to the fishing spots, climbing in and out of the boat." (Tr. 172). He denied membership in church, clubs, or other organizations, but stated that he visited the library often to use the Internet to "stay up with job hunting and stuff like that, and looking all the time for things to do." (Tr. 173-74). Plaintiff testified that he enjoyed photography, and often photographed backyard birds. (Tr. 173-74).

Plaintiff testified that he last applied for a job on the Monday of the preceding week. (Tr. 174). He stated that he applied for two help desk jobs, and one customer support job, all

computer-related positions. (Id.) Plaintiff testified that, during job interviews, he was "upfront" with the interviewer and told him or her that he would require frequent breaks to go to and from the restroom and that, depending on how far away the restroom facilities were located, this break may take up to four minutes. (Tr. 183-84).

Plaintiff testified that he was currently receiving unemployment compensation benefits, and had been receiving them since 2008. (Tr. 180-81). Plaintiff acknowledged that, to receive unemployment benefits, he attested that he was ready, willing and able to work, and that this allegation differed from that he was making to the Social Security Administration in an effort to receive disability benefits. (Tr. 182-83).

The ALJ then heard testimony from John A. Grenfeld, a Vocational Expert (also "VE"). The ALJ asked Mr. Grenfeld to describe plaintiff's past work, and Mr. Grenfeld testified that plaintiff had held a number of skilled jobs in the past. (Tr. 176). Mr. Grenfeld classified plaintiff's past work as either sedentary (software consultant, manager of a software company) or light (customer service, computer sales, slot attendant on a boat), and testified regarding the skill and exertion levels of those past jobs. (Tr. 176-77). Mr. Grenfeld testified that plaintiff had transferable skills from the three light jobs to the sedentary exertional level. (Tr. 177-78). Mr. Grenfeld testified that those transferable skills were to jobs in finance, such as bank teller or

-6-

cashier. (Tr. 178). Mr. Grenfeld then testified that the sedentary cashier position was semi-skilled, and that the skills that would transfer to that position were the ability to operate computers, the ability to maintain records, and the knowledge and use of financial procedures for investment services. (Tr. 178). Mr. Grenfeld testified that plaintiff was performing these skills in his customer service work at Western Union. (Id.)

Plaintiff's attorney then asked Mr. Grenfeld whether there were any jobs for a person of plaintiff's age, education and background who required frequent breaks during the day, more than three per day, approximately one break every half hour. (Tr. 179). Mr. Grenfeld replied "[i]f he has to take breaks every half hour, that would be considered excessive, and he would not be retained." (Tr. 179).

B. Medical Evidence[2]

Medical records from Endocrinologist Christy Richardson, M.D., show that plaintiff was seen on September 6, 2005 for care related to a left adrenal mass. (Tr. 392). Plaintiff reported that he was feeling ok, and denied abdominal pain. (Id.) A CT scan of his abdomen and pelvis revealed a small gallstone, a slight prominence of the left adrenal gland, and a prominent prostate gland. (Tr. 385). Plaintiff was diagnosed with insulin-resistant

_____

[2]The following summary contains medical information dated outside of the relevant time period, and evidence added to the administrative record after the date of the ALJ's decision.

diabetes mellitus, an adrenal mass, high cholesterol, and hypertension. (Tr. 391-92). Dr. Richardson also noted that plaintiff was obese. (Tr. 363-97). Plaintiff continued to see Dr. Richardson for follow-up care for these conditions through January 27, 2009. (Id.) On multiple occasions, Dr. Richardson noted the presence of +1 or trace edema in plaintiff's extremities. (Tr. 366, 369, 370, 371, 387, 388, 389, 390, 392). On two occasions, Dr. Richardson noted no edema. (Tr. 367, 391).

On February 8, 2007, plaintiff was seen by cardiologist Darlene L. Eyster, M.D., F.A.C.C., of the Metro Heart Group of St. Louis. (Tr. 515). Dr. Eyster noted that plaintiff had diabetes, hypertension, and high cholesterol, but no chest pain or shortness of breath. (Id.) She noted that plaintiff's blood sugars had been problematic lately, and that he was trying to get an insulin pump. (Id.) Plaintiff reported that he dieted and walked regularly for exercise, and that he had lost a significant amount of weight. (Id.) Plaintiff reported that he was working full-time. (Tr. 515). He reported that he was taking numerous medications for hypertension and fluid retention, insulin for diabetes, Sertraline for depression, and a nasal spray for allergies. (Id.) He reported arthritis of the knees. (Id.)

Upon examination, Dr. Eyster noted that plaintiff was morbidly obese, and had 1+ pitting edema. (Id.) Cardiac examination, including EKG, revealed a systolic murmur and evidence of some valve regurgitation. (Tr. 515-16). Dr. Eyster diagnosed

-8-

congestive heart failure with metabolic syndrome including hypertension, diabetes, high blood cholesterol, morbid obesity, sleep apnea, and heart murmur with valve regurgitation. (Tr. 516). She advised plaintiff to follow up on an annual basis. (Tr. 516).

On March 20, 2007, plaintiff underwent a Doppler echocardiogram at Metro Heart Group which revealed concentric left ventricular hypertrophy, moderate left atrial enlargement, left ventricular enlargement, aortic dilation and aortic valve sclerosis. (Tr. 510-11).

Also on March 20, 2007, plaintiff was seen by Mark A. Faron, M.D. of Florissant Oaks Internal Medicine for care related to diabetes and high cholesterol. (Tr. 479). Plaintiff denied chest pain and shortness of breath. (Id.) Plaintiff reported that he exercised (walked) four times per week and followed a weight regulation diet. (Tr. 480). Upon examination, plaintiff appeared healthy and in no apparent distress. (Id.) Respiratory and cardiac examination were normal. (Id.) There was no edema. (Id.) Plaintiff's medication regimen was not changed. (Tr. 480).

Adenosine cardiac stress testing performed on April 17, 2007 at Metro Heart Group revealed no EKG changes during adenosine infusion. (Tr. 504). Radiographic imagining revealed a posterolateral defect, and could not rule out a corresponding prior infarct, and a mild decrease in left ventricular systolic function with an ejection fraction of 42%. (Id.)

Plaintiff returned to Dr. Faron on May 10, 2007 with

complaints of a split lip that would not heal. (Tr. 477). He
reported having been dehydrated. (Id.) Plaintiff's wound was
treated and his insulin dosage was increased. (Tr. 477-78). On
May 24, 2007, plaintiff complained of a cough, watery eyes and a
scratchy throat. (Tr. 475). His lip wound had improved. (Id.)
Plaintiff was treated with antibiotic medication and an over-the-
counter expectorant. (Tr. 476). He returned on June 26, 2007 for
follow up related to diabetes and hypertension. (Tr. 472). He
denied chest pain and shortness of breath, and denied experiencing
shortness of breath upon exertion, and stated that in fact he
walked often for exercise. (Tr. 473). Dr. Faron noted no edema.
(Tr. 473). Metabolic testing was ordered, and plaintiff's
medications were adjusted. (Id.)

Plaintiff returned to Dr. Faron on November 6, 2007 for
follow up related to diabetes and hypertension. (Tr. 468). Dr.
Faron noted that plaintiff denied depressive symptoms. (Id.)
Plaintiff also denied experiencing shortness of breath upon
exertion, while lying down, or at night. (Id.) Plaintiff also
denied pedal edema, palpitations, or chest pain. (Id.) Diabetic
foot examination was negative. (Tr. 470). Plaintiff's blood
pressure was satisfactory. (Id.)

Plaintiff returned to Dr. Faron on January 15, 2008 with
complaints of congestion and cough. (Tr. 466). He denied
shortness of breath and wheezing. (Id.) Upon examination, Dr.
Faron noted 1+ edema bilaterally. (Tr. 467). Respiratory and

cardiac examination were normal. (Id.) Plaintiff was treated with antibiotics and an over-the-counter expectorant. (Id.) Plaintiff returned on February 5, 2008 for follow up care related to diabetes and hypertension. (Tr. 463). It was noted that plaintiff's insulin and hypertension medication had been increased. (Id.) Plaintiff denied chest pain, palpitations, and shortness of breath. (Tr. 464).

On May 6, 2008, plaintiff returned to Dr. Faron with complaints of having to urinate every half hour at night. (Tr. 449). He stated that he suffered from ankle edema that resolved overnight. (Id.) Upon examination, no edema was noted. (Tr. 451). It was suspected that his nighttime urination was due to fluid in his legs "reequilibrating" overnight, and plaintiff was told to elevate his feet before going to bed and to lose weight. (Tr. 452). Plaintiff was diagnosed with uncontrolled diabetes mellitus with renal manifestations, chronic kidney disease, congestive heart failure, and hypertension, and it is indicated that plaintiff would be monitored on his current medications. (Id.)

Plaintiff returned to Dr. Faron on July 29, 2008 with complaints of having scraped his right shin, and it was noted that plaintiff had a shallow ulcer on his right mid shin. (Tr. 439). He was diagnosed with cellulitis and treated with silver sulfadiazine cream. (Id.)

Plaintiff returned to Dr. Faron on August 11, 2008 and

again on October 30, 2008 with complaints related to a shingles rash. (Tr. 420-37). He had no edema and a normal mood and affect. (Tr. 431). He returned on November 11, 2008 for follow up, and it was noted that his rash was improving and that he had a normal mood and affect, and no leg swelling, chest pain, or shortness of breath. (Tr. 410-11).

On January 27, 2009, plaintiff saw Dr. Richardson and reported that he was regularly testing his blood sugar and taking his medications, and Dr. Richardson noted that he was keeping his appointments. (Tr. 363). Plaintiff denied fatigue, fever, cough, chest pain, and abdominal pain. (Id.) Plaintiff complained of "moderate" right knee pain with motion, and pain in his left knee with "moderately reduced" range of motion. (Tr. 364). Pitting edema was present on plaintiff's bilateral lower extremities. (Id.) There was no evidence of depression. (Id.) Dr. Richardson characterized plaintiff's blood sugar as uncontrolled, and adjusted his insulin dosage. (Tr. 363-64). She noted that plaintiff had filed for disability. (Tr. 364).

Plaintiff returned to Dr. Eyster on February 16, 2009 with reports of depression, some shortness of breath on exertion, urinary frequency, arthritis in his knees and some leg pain/fatigue. (Tr. 500, 502). He reported that he walked for thirty minutes three times per week, and that his weight had decreased from nearly 350 pounds to 278. (Id.) He reported that he prepared meals that contained vegetables and no fried foods.

(Tr. 500). Dr. Eyster noted that plaintiff's EKG revealed sinus rhythm, but poor R-wave progression, and left anterior fascicular block. (Id.) She diagnosed plaintiff with congestive heart failure with cardiomyopathy, hypertension, diabetes, high blood cholesterol, and obesity. (Id.) Dr. Eyster adjusted plaintiff's blood pressure medication and ordered thallium stress testing. (Tr. 501).

Plaintiff returned to Dr. Faron on February 19, 2009 and reported some lingering pain in the shingles rash area, and it was noted that his insulin had been increased. (Tr. 400). Examination was normal, no edema was noted, and his affect and mood were normal. (Tr. 402).

Plaintiff returned to Metro Heart Group on March 11, 2009 for testing to rule out coronary ischemia. (Tr. 497). Testing was stopped due to chest pain and fatigue, but plaintiff experienced no chest discomfort. (Id.) Testing revealed no ischemia, but did reveal reduced heart function, with a left ventricular ejection fraction of 33%. (Id.)

On March 31, 2009, Donna Muckerman-McCall, D.O., completed a Physical Residual Functional Capacity Assessment in which she opined that plaintiff could occasionally lift and/or carry ten pounds and could frequently lift and/or carry less than ten; could stand or walk for at least two hours in an eight-hour day and sit for six, and could push and/or pull without limitation. (Tr. 529). She opined that plaintiff should never climb a ladder,

-13-

rope or scaffold, but that he could occasionally perform all other postural limitations. (Tr. 528-34). She found no manipulative or visual limitations, and opined that plaintiff should avoid even moderate exposure to fumes, odors, dusts, gases, and the like, but few other environmental limitations. (Tr. 532).

On March 31, 2009, plaintiff underwent a MUGA scan (a test to check whether the heart is pumping blood properly) which revealed overall global hypokinesis (diminution/abnormally slow movement) with a left ventricular ejection fraction of 32%, an abnormally low finding. (Tr. 553).

On April 29, 2009, plaintiff saw Dr. Richardson for follow up related to diabetes, hypertension, high blood cholesterol, adrenal mass, and obesity. (Tr. 600). Dr. Richardson noted that plaintiff's diabetes was uncontrolled and gave plaintiff a new meter, stating that she was considering changing his current regimen. (Tr. 601).

On May 2, 2009, plaintiff underwent a psychological evaluation with Martin Rosso, Ph.D., of Florissant Psychological Services, Inc. (Tr. 536-38). Dr. Rosso noted that plaintiff walked with a mild limp, and was appropriately friendly and cooperative. (Tr. 536). Plaintiff reported suffering from congestive heart failure, diabetes, sleep apnea, and arthritis in his leg. (Id.) Plaintiff reported that, around the year 2000, he experienced depression related to the loss of his job, but stated that he had not taken medication for it for several years and

reported that he was doing "pretty good." (Id.) He denied any history of inpatient psychiatric treatment and claimed that medication and counseling given him after he lost his job helped him and he had not been receiving treatment for depression for several years. (Tr. 537).

Plaintiff reported that, after he lost his job in December of 2000, he obtained jobs with CompUSA as a salesman and with Ameristar Casino, but was unable to perform the required standing and walking. (Tr. 536). Plaintiff reported that he then got a job with Western Union, but that office closed and moved to Mexico in 2007, and he has been unemployed since. (Id.) Plaintiff reported being limited in his physical activities, inasmuch as he could no longer fish or hunt as he had once done. (Tr. 537).

Upon examination, Dr. Rosso found plaintiff to perform in the average range in terms of his vocabulary, cognitive ability, abstract verbal reasoning, fund of learned information, ability to explain answers to everyday problems, short and long-term memory, insight, and judgment. (Id.) Dr. Rosso found plaintiff to be alert and oriented and aware of current events, and to exhibit normal speech and thinking. (Id.) Plaintiff denied experiencing hallucinations, and Dr. Rosso noted no delusional thinking. (Tr. 537-38). Plaintiff denied that he was depressed and reported no abnormal anxiety. (Id.)

On May 13, 2009, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique form. (Tr. 541-51). Dr. DeVore

-15-

determined that plaintiff had a major depressive disorder which was in remission and was not a severe impairment. (Tr. 541-44). Dr. DeVore determined that plaintiff had mild limitations in the areas of activities of daily living and maintaining concentration, persistence or pace, but no other limitations. (Tr. 549).

On June 2, 2009, plaintiff saw Dr. Faron and denied chest pain, leg swelling, abdominal pain and depression. (Tr. 590). Dr. Faron noted no edema and a normal mood and affect. (Id.)

On June 11, 2009, plaintiff saw Dr. Richardson for follow up related to diabetes. (Tr. 597). Plaintiff reported that he had stopped snacking, and that his blood sugar readings had improved. (Id.) He reported no fatigue or weakness or insomnia. (Id.) Dr. Richardson recommended that plaintiff continue his current medication dosages and with diet management. (Tr. 598).

On November 12, 2009, plaintiff was seen by Dr. Faron with complaints of a productive cough and sinus congestion. (Tr. 564). Plaintiff was unsure whether he was taking Lipitor. (Id.) He reported having lost 25 pounds on a Weight Watchers diet. (Id.) Dr. Faron found no edema. (Tr. 566). Dr. Faron diagnosed acute bronchitis and prescribed antibiotics and an over-the-counter decongestant/expectorant. (Tr. 567).

On January 6, 2010, plaintiff saw Dr. Richardson for follow up related to diabetes. (Tr. 594). Plaintiff's recent blood sugar readings were noted to be high, and he admitted to dietary indiscretion. (Id.) He reported that he was taking

medications regularly. (Id.) Plaintiff's insulin dosage was adjusted. (Id.)

The following medical evidence was added to the administrative transcript after the date of the ALJ's decision. On February 15, 2010, Dr. Eyster completed a report entitled New York Heart Association's Classification Of Patients With Diseases Of The Heart. (Tr. 611-16). Dr. Eyster classified plaintiff's condition as "Class II"[3] which was defined as "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain." (Tr. 611). Dr. Eyster noted that plaintiff's diagnosis, with New York Heart Association functional classification, was congestive heart failure, cardiomyopathy, morbid obesity, hypertension, diabetes, and high blood cholesterol. (Tr. 612). Dr. Eyster identified the clinical findings and test results that showed plaintiff's medical impairments as a stress test and a MUGA scan showing abnormally low ejection fractions. (Id.)

The form included a section with a long list of symptoms, including chest pain, edema, palpitations, dizziness, and the like, and asked that the patient's symptoms be identified. (Tr. 612). The only symptom Dr. Eyster identified was shortness of breath. (Id.) Dr. Eyster indicated that plaintiff was not a malingerer.

─────────────

[3]The scale describes classes ranging from I (least severe) to IV (most severe). (Tr. 611).

(Tr. 613). She opined that plaintiff did not have marked limitation of physical activity. (Id.) Dr. Eyster opined that stress would cause shortness of breath upon exertion. (Id.)

The form also solicited a great deal of information regarding the degree to which the patient could tolerate work stress, how the patient's condition would affect his ability to perform work-related duties, his work-related abilities and limitations, and so forth. These questions were numbered 9 through 18, and spanned over three pages of the form. See (Tr. 613-16). However, instead of answering the individual questions on the form, Dr. Eyster wrote "See Medical Rec" or "See Med Rec" over the text on each page that solicited this information. See (Id.) Dr. Eyster did not indicate which of her medical records contained information that was responsive to the questions. See (Id.)

On November 8, 2010, plaintiff saw Dr. Eyster and denied palpitations, chest pain, and shortness of breath, and it was noted that he continued to lose weight. (Tr. 9). Plaintiff reported that he kept himself busy doing household chores, cooking, and taking care of his grandchildren as needed. (Id.) Dr. Eyster noted that plaintiff had no symptoms attributable to valvular heart disease. (Id.) Dr. Eyster diagnosed cardiomyopathy with abnormally low ejection fraction, hypertension, diabetes, and morbid obesity, and indicated that she had discussed with plaintiff the rationale for primary prevention implantable cardioverter-defibrillator (also ICD) and that plaintiff agreed. (Tr. 10).

Cardiac catheterization performed on February 8, 2011 at St. Joseph Health Center was interpreted as revealing noncritical coronary disease, severe left ventricular systolic dysfunction consistent with nonischemic cardiomyopathy of 25-30%, global left ventricular hypokinesis, elevated right and left heart filling pressures with severe pulmonary hypertension, and systemic hypertension. (Tr. 38-41).

On February 15, 2011, plaintiff saw Rajiv Handa, M.D. of the Heart Specialty Associates for "assessment for an ICD implantation for primary prevention of sudden cardiac death." (Tr. 28). Dr. Handa noted that plaintiff had no chest discomfort suggestive of ischemia, but that he did have shortness of breath and breathlessness on exertion. (Id.) Dr. Handa characterized plaintiff's functional status as New York Heart Association Class II/III "for the most part with recent class V decompensation." (Tr. 29). Dr. Handa recommended additional testing to evaluate plaintiff's candidacy for an ICD. (Tr. 28-29). MUGA scan performed on February 18, 2011 revealed cardiomyopathy with severe hypokinesis, mild left ventricular and atrial enlargement, and left ventricular ejection fraction estimated at 34%. (Tr. 44). On March 4, 2011, Dr. Handa performed ICD implantation at St. Joseph Health Center, having noted plaintiff's diagnoses as nonischemic cardiomyopathy, congestive heart failure, New York Heart Association Class III, ejection fraction of 30-35%, diabetes, and hypertension. (Tr. 123-25).

### III. The ALJ's Decision

The ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 139). The ALJ determined that plaintiff had the severe impairments of congestive heart failure, cardiomyopathy, hypertension, diabetes mellitus II, hyperlipidemia, chronic kidney disease, and adrenal mass, sleep apnea, and obesity. (Id.) The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 140). In so finding, the ALJ wrote that he had considered the cumulative effects of obesity. (Id.)

The ALJ determined that plaintiff had the residual functional capacity (also "RFC") to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), but should never climb ladders, ropes or scaffolds, and should avoid even moderate exposure to hazards such as machinery and heights, and concentrated exposure to extreme temperatures. (Id.) The ALJ concluded that plaintiff was capable of performing his past relevant work as a software consultant, which is sedentary, and software company manager, which is sedentary. (Tr. 146). The ALJ determined that this work did not require the performance of work-related activities precluded by plaintiff's residual functional capacity. (Id.) The ALJ concluded that plaintiff had not been under a disability, as such is defined in the Act, at any time

through the date of the decision.  (Id.)

## IV.  Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is

working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

     The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks

and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

"[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence. In support, plaintiff claims that the ALJ's decision is contrary to the weight of the evidence presently of record, which now includes additional evidence that was material to his medically determinable impairments during the period of disability. Plaintiff also argues that the ALJ failed to properly consider his credibility. The

undersigned will consider plaintiff's second argument first.[4]

In determining the credibility of a claimant's subjective complaints, an ALJ must consider all evidence relating to those complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

---

[4]Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217). An ALJ's credibility determination is essential to the ALJ's determination of other issues, including plaintiff's RFC. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010).

Plaintiff argues that the ALJ's credibility determination is insufficient because the ALJ failed to address plaintiff's testimony regarding the side effects of Lasix. Plaintiff's argument is well-taken. <u>Polaski</u> requires an ALJ to consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." <u>Medhaug v. Astrue</u>, 578 F.3d 805, 816 (8th Cir. 2009) (citing <u>Polaski</u>, 739 F.2d at 1322). The undersigned recognizes that the Eighth Circuit does not require an ALJ to explicitly discuss each <u>Polaski</u> factor and explain its impact. <u>Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004).

As summarized above, during the administrative hearing, plaintiff testified regarding his need to urinate frequently and explained that this was caused by a side effect of Lasix and also his conditions. Plaintiff also described how his need for frequent restroom breaks impacted his ability to function in the workplace, specifically in his customer service job at Western Union. The vocational expert in this case then testified that taking more than three breaks during the work day, approximately one every half-hour, would be considered excessive and such an individual would not be retained. In response to plaintiff's argument, the Commissioner contends that plaintiff failed to meet his burden to prove that his urinary frequency was as frequent as he alleged.

While the ALJ acknowledged that consideration of

medication side effects was an element of credibility determination, his decision makes no mention of plaintiff's testimony that he needed to urinate frequently due to, <u>inter alia</u>, Lasix. This is significant because plaintiff then testified that his need for frequent urination adversely impacted his ability to perform at least one of the jobs he had held, testimony the ALJ's decision also fails to mention. Because the ALJ wholly failed to mention plaintiff's allegation, the undersigned is unsure whether the ALJ considered and rejected it based upon the evidence of record, as the Commissioner suggests, or whether the ALJ failed to consider it at all. The undersigned therefore cannot confidently say that the ALJ properly considered the side effects of plaintiff's medication, as <u>Polaski</u> requires him to do.

The ALJ's decision also contains other deficiencies that undermine confidence in his credibility determination. The ALJ placed great emphasis on the lack of a supporting statement of disability from any of plaintiff's treating physicians, calling this a "key factor" in plaintiff's case. (Tr. 144). The ALJ made frequent mention of this and of plaintiff's testimony that plaintiff thought his doctors were neutral on the issue of disability. (Tr. 141, 144, 145, 146). Examples are as follows:

> The claimant's doctors know he has applied for disability. It is the claimant's opinion that his doctor's [sic] are neutral on the issue. They have not come out either way to say he should or should not apply. (Tr. 141).

The claimant has severe impairments, however, the medical records do not document that any treating physician has ever found or imposed any long term, significant and adverse mental or physical limitations upon the claimant's functional capacity. (Tr. 144).

A key factor in this case is the lack of any supporting statement of the disability claim from any of claimant's treating physicians. (<u>Id.</u>)

The claimant was very forthright in his testimony. The claimant testified his doctors are neutral on the issue of disability. (Tr. 145).

There is a lack of any supporting statement of disability claim from any of the claimant's treating physicians. (<u>Id.</u>)

At the conclusion of his analysis, the ALJ wrote:

As for the opinion evidence, considerable weight is afforded to the claimant's treating and examining physicians and the remainder of the record. Considerable weight is afforded to the State Agency reviewing physician that indicates the claimant can do sedentary work. This conclusion is consistent with the claimant's acknowledged activities. According to the claimant's testimony his doctor of 30 years is neutral on the issue of his disability. Thus, the opinion of the agency reviewer is the only medical opinion of record." (Tr. 145-46).

The ALJ's emphasis on what plaintiff believed his doctors thought about his disability claim is troubling. While an ALJ is indeed obligated to consider a claimant's testimony, the ALJ here appeared to use plaintiff's testimony on the subject of what his

-27-

doctors thought about the fact he had applied for disability as evidence that his doctors' opinions were inconsistent with plaintiff's subjective complaints and with a finding of disability. However, plaintiff's guess as to what his treating physicians thought about the fact he had applied for benefits cannot constitute substantial evidence to support the ALJ's adverse credibility determination. This is especially true when plaintiff's actual testimony on this subject is considered. Plaintiff testified that he supposed his doctors were "neutral" on the subject of his disability applications because they had not "really come out either way, you know, saying, you know, 'You shouldn't apply,' or – – ." (Tr. 166). The fact that plaintiff's guess was based upon the absence of a statement either way instead of upon a clear statement of neutrality further underscores the error inherent in the ALJ's reliance upon this evidence.

The ALJ also heavily emphasized the lack of an opinion from any of plaintiff's treating physicians supporting plaintiff's disability claim, noting that this was a "key factor" in plaintiff's case. (Tr. 144). While an ALJ is certainly entitled to consider the lack of reliable medical opinions supporting a claimant's allegations of disabling symptoms, Johnson v. Chater, 87 F.3d 1015, 1017–18 (8th Cir. 1996), in the case at bar, this does not constitute substantial evidence supporting the ALJ's adverse credibility determination. Plaintiff's treating physicians were indeed silent on the issue of plaintiff's ability to function in

the workplace. However, they were not asked to assess plaintiff's ability to function in the workplace and express an opinion on the subject, nor did any of them state that plaintiff should be discharged from treatment. Their silence on the matter therefore cannot constitute substantial evidence to support the ALJ's decision. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 943-44 (8th Cir. 2009); <u>see</u> <u>also</u> <u>Lauer v. Apfel</u>, 245 F.3d 700, 705 (8th Cir. 2001) (the absence of an opinion by the claimant's psychiatrist regarding plaintiff's ability to engage in work-related activities did not constitute substantial evidence supporting the ALJ's findings where that psychiatrist was not asked to offer an opinion on that issue and especially where that psychiatrist did not discharge plaintiff from treatment or state he could engage in full-time employment).

The ALJ also noted that the record contained no evidence that plaintiff "complains of edema of his legs every time he goes to the doctor as the attorney suggested at the hearing. In fact, there is only one instance of such, Exhibit 2F/55."[5] (Tr. 144). The ALJ appeared to have relied on this observation to support his adverse credibility determination. Contrary to the ALJ's

---

[5]The exhibit cited by the ALJ is found at page 452 of the Administrative Transcript, and reflects part of Dr. Faron's May 6, 2008 office note. On the page in question, Dr. Faron writes that he suspects that plaintiff's need to urinate at night "is due to fluid in his legs reequilibrating over night" and that plaintiff should therefore elevate his feet before going to bed. (Tr. 452). The particular page cited by the ALJ does not mention what if anything plaintiff actually told Dr. Faron about edema in his legs.

observation, the record contains numerous medical records documenting findings of trace edema, 1+ edema, and pitting edema in plaintiff's bilateral lower extremities. (Tr. 364, 366, 369, 370, 467, 500). The undersigned recognizes that the ALJ wrote that the record failed to document that plaintiff complained of edema in his legs, not that edema was absent upon physical examination. However, it seems reasonable to conclude that plaintiff may have considered it unnecessary to call his doctor's attention to edema when it was obviously present and noted by the doctor upon physical examination. Furthermore, the page cited by the ALJ fails to list any of plaintiff's subjective complaints, and instead discusses Dr. Faron's idea of why plaintiff needed to urinate frequently during the night. See (Tr. 144, 452). While the ALJ did not explicitly state the significance of this observation or the weight placed thereon, he did appear to view it as evidence that plaintiff's subjective complaints were not supported by the record. While this alone may not defeat an otherwise well-supported credibility determination, in light of the foregoing deficiencies, it further diminishes the undersigned's confidence in the ALJ's decision.

Plaintiff contends that, because the ALJ found that he had a strong work history and motivation to work and was forthright in his testimony, the ALJ was obligated to find plaintiff credible and disabled. It is proper for an ALJ to consider his or her own personal observations of a claimant's demeanor. Johnson, 240 F.3d at 1147-48 (citing Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir.

1993)).  It is also proper to consider a claimant's work history
and motivation to work.  <u>Pearsall</u>, 274 F.3d at 1218.  While the
fact that the ALJ made these observations does not demand a finding
of disability in this case, as plaintiff contends, in light of the
other deficiencies in the ALJ's decision, they do support
plaintiff's argument that the ALJ's credibility determination was
deficient.

The Commissioner contends that the fact that plaintiff
left employment for reasons other than disability supports the
ALJ's adverse credibility determination.  Indeed, while not
dispositive, such evidence can serve as substantial evidence
supporting an adverse credibility determination.  <u>Depover v.
Barnhart</u>, 349 F.3d 563, 566 (8th Cir. 2003) (it was not
unreasonable for the ALJ to consider that plaintiff left his job
because the job ended instead of an inability to perform the work).
In the case at bar, however, the record also includes evidence that
plaintiff told Dr. Rosso that, after he lost his job in December of
2000, he obtained jobs with CompUSA as a salesman and with
Ameristar Casino, but "couldn't deal with the standing and walking
required."  (Tr. 536).  This evidence fairly detracts from the
ALJ's observation that plaintiff left employment for reasons other
than disability.  <u>See</u> <u>Coleman</u>, 498 F.3d at 770; <u>Warburton</u>, 188 F.3d
at 1050.

The Commissioner also argues that support for the ALJ's
adverse credibility determination can be found in the fact that

plaintiff received unemployment compensation benefits and testified that he was looking for work. Indeed, while such evidence is not dispositive, it can serve as substantial evidence supporting an adverse credibility determination. <u>Johnson v. Chater</u>, 108 F.3d 178, 180 (8th Cir. 1997) (internal quotation omitted) (a claimant may essentially admit an ability to work by applying for unemployment compensation benefits because the application requires one to hold himself out as willing and able to work). In the case at bar, however, plaintiff testified that, when he interviews for jobs, he tells the interviewer that he requires frequent restroom breaks. (Tr. 183-84). This is entirely consistent with plaintiff's testimony regarding medication side effects, discussed above.

Having considered the ALJ's adverse credibility with the requisite deference, the undersigned concludes that it is not supported by substantial evidence on the record as a whole. The Commissioner's decision should therefore be reversed and this cause should be remanded to the Commissioner for further consideration of plaintiff's claim.

In view of the finding that the ALJ erred in his credibility determination, the undersigned finds that the hypothetical question he posed to the vocational expert did not adequately reflect plaintiff's impairments. Accordingly, the testimony of the vocational expert that jobs exist for plaintiff cannot constitute substantial evidence on the record as a whole to

support the ALJ's decision.  See Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000)(citing Pratt v. Sullivan, 956 F.2d 830, 836 (8th Cir. 1992)).

Plaintiff also contends that the ALJ failed to ensure a fully and fairly developed record because he failed to properly consider third-party evidence.  As part of his adverse credibility determination, the ALJ wrote the conclusory statement: "[t]here are few third party observations corroborating the complaints."  (Tr. 145).  Plaintiff complains that the ALJ did not mention plaintiff's wife's statement, which plaintiff claims corroborated his subjective allegations.  Plaintiff also complains that the ALJ appeared to note that there were not enough corroborating third party statements when in fact plaintiff had, on Form SSA-3368, offered the name of a witness the ALJ could have, but did not, contact.  While this alone does not support a finding that the ALJ failed to ensure a fully and fairly developed record, on remand, if the ALJ considers third party statements significant, he should explain his view of the relationship between any existing third party statements and plaintiff's subjective allegations.  If the ALJ considers it significant that there are too few corroborating third party statements in the record, he should ensure that he has made an effort to contact potential witnesses offered by the claimant before simply reaching that conclusion.

Finally, plaintiff contends that the ALJ's decision is contrary to the weight of the evidence currently of record,

including new evidence which was considered by the Appeals Council. However, an ALJ's credibility determination is essential to the ALJ's determination of other issues, including plaintiff's RFC and his determination that a claimant is not disabled under the Act. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010). Because the ALJ's credibility determination was legally insufficient, and because credibility determination is essential to the ALJ's RFC and disability determinations, the undersigned cannot proceed to determine whether the ALJ's RFC determination or his ultimate decision regarding disability were supported by substantial evidence on the record as a whole. On remand, it will be for the ALJ, after conducting a legally sufficient credibility determination, to formulate plaintiff's RFC and to reach an ultimate decision regarding whether plaintiff is disabled as defined by the Act.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be reversed, and this cause remanded to the Commissioner for further proceedings.

The parties are advised that they have until August 31, 2012, to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_ (signature)

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of August, 2012.